FREDERICKA HOMBERG WICKER, Judge.
 

 |2In this criminal proceeding, Cesar A. Lobo, defendant/appellant, appeals his sexual battery conviction and his eight-year
 
 *430
 
 hard labor sentence
 
 [1]
 
 imposed without benefit of parole, probation, or suspension of sentence. The state originally charged Mr. Lobo by bill of information with simple rape, in violation of La.R.S. 14:43. A few months before trial, the state amended the bill of information to sexual battery, La.R.S. 14:43.1, a lesser charge. After a trial on the merits, a six-person jury found Mr. Lobo guilty of the amended charge, sexual battery. Mr. Lobo filed timely motions for appeal and to reconsider sentence.
 
 [2]
 
 Mr. Lobo assigns these errors:
 
 [3]
 
 (1) insufficiency of the evidence for conviction; (2) error in denying his motion to suppress statements; and, (3) sentencing errors. We affirm lathe conviction. But because the trial judge did not rule on an outstanding motion to reconsider sentence, the sentencing issues are premature and we remand for a ruling on the motion. We also remand for correction of a clerical error in the minute entry/commitment. Facts
 

 On June 7, 2009, Kenner police responded to a call reporting the alleged offense that had reportedly occurred the previous night at a party at the victim’s apartment. At trial the state presented testimony from two police officers, the victim, and the victim’s boyfriend. The state also introduced Mr. Lobo’s police statement into evidence. The defense presented testimony from Mr. Lobo’s sister, wife, and brother-in-law. With the exception of the police officers and Mr. Lobo’s sister, the witnesses testified through an interpreter.
 

 On June 6, 2009, the victim,
 
 [4]
 
 A.R., (born in Mexico), C.E., the victim’s boyfriend, (from Honduras), and Mr. Lobo, (Mr. C.E.’s uncle), agreed that they, along with others, attended a party at A.R. and C.E.’s Kenner apartment.
 

 A.R. testified that day Mr. Lobo, his wife and his young daughter were present. Along with Mr. Lobo’s sister, and his sister’s husband as well as a friend. According to A.R. and C.E., some of the other partygoers, including Mr. Lobo, began playing card games; however, A.R. (the victim) did not participate because she left the party to go to sleep. According to A.R., she left at 11:00 p.m.
 

 It is undisputed that people were also drinking at the party. A.R. admitted that she drank “three daiquiri bottles” throughout the night, but she was not intoxicated. A.R. further explained that she slept in the dark with the light off, and a thick blanket she threw over the window to further darken the room. When she went to sleep for the night, she left her bedroom door open. A.R. stated that there [4was one upstairs and one downstairs bathroom and people at the party were using the upstairs bathroom throughout the night. In addition, she and C.E. testified that there was
 
 *431
 
 a bottle of liquor in the bedroom where she was asleep.
 

 Subsequently, the victim woke with Mr. Lobo on top of her. Her pajamas were no longer on, her pants were down by her knees, and Mr. Lobo was “abusing [her].” She specifically stated that Mr. Lobo was “penetrating [her] vagina,” and that she was menstruating at the time. She further explained that she was sleeping “profoundly,” and she did not know why or when Mr. Lobo entered her room, or how long he was in the room before she awoke. When she felt someone kissing her, she initially thought it was her boyfriend, because he was the only person who enters her bedroom or touches her. But, she realized it was not her boyfriend when she touched his arm, because her boyfriend was wearing a short-sleeved shirt and Mr. Lobo was wearing a long-sleeved shirt. She then told Mr. Lobo he was not C.E. and threw him off of her. She testified that she had not given Mr. Lobo consent to touch her vagina.
 

 C.E. testified that Mr. Lobo left the card table and went to the upstairs bathroom and later returned. Then, Mr. Lobo left the table again, without telling anyone where he was going. At some point, Mr. Lobo’s wife expressed concern about his whereabouts. L.L., (Mr. Lobo’s sister), D.D., (Mr. Lobo’s wife) and J.E.B. (Mr. Lobo’s brother-in-law) testified that they attended the party and Mr. Lobo was absent from the card game less than five minutes.
 

 C.E. stated that when C.E. was looking for Mr. Lobo, C.E. heard a thump when he (C.E.) was walking towards the stairs. “[They] couldn’t find [Mr. Lobo] anywhere, and his car was still there, and [C.E.’s room] was the last place to look.”
 

 A.R. and C.E. testified that C.E. came up the stairs, and opened the then locked bedroom door with a key. C.E. testified that when he entered the darkened Lbedroom and turned on the lights, he saw Mr. Lobo on the floor trying to pull up his pants, including his underwear. A.R. and C.E. stated that Mr. Lobo then said: “hit me, hit me.” In his statement to the police, Mr. Lobo admitted saying that and explained that he felt he had failed his uncle.
 

 C.E. admitted that he did not see Mr. Lobo on top of the victim and he did not know what happened in the room before he walked in. C.E. threw Mr. Lobo out of the apartment.
 

 A.R. testified that after the incident, C.E. placed the bedding sheets and A.R.’s clothes, which had blood on them, in a bag. A.R. and C.E. testified that they did not call the police on the night of the incident because of family concerns. In addition, A.R. stated that she did not call immediately because everyone was blaming her. However, C.E. and A.R. stated that they went to two churches for help and thereafter called the police.
 

 A.R. specifically testified that she did not give Mr. Lobo permission to touch her. The incident continues to affect her. C.E. testified that A.R. was in shock after the incident. A.R. testified that she fears the dark and now locks rooms within the apartment, something she never did before.
 

 Officers Christine Urrata and Detective George Hoffman investigated the incident.
 

 Officer Urrata testified that she has been a patrol officer for the Kenner Police Department for about three and a half years. On June 7, 2009, she responded to a call at a Kenner apartment, with fellow officer, Irma Morehouse. When she arrived at the apartment, the A.R. (the victim) and C.E. (the boyfriend) were present. A.R. appeared to be afraid and timid, and C.E. appeared to be “a little upset.”
 

 
 *432
 
 | (¡A.R. and C.E. could not speak English, so Officer Morehouse, who was a Spanish speaking officer, communicated with them. After speaking with them, C.E. and A.R. identified Mr. Lobo (C.E.’s nephew) as the person responsible for the incident that occurred the previous day. After Officer Urrata took the victim and the witness’ statements, they directed her to Mr. Lobo’s location. The victim and witness positively identified Mr. Lobo.
 

 Officer Urrata testified that after the victim and witness identified Mr. Lobo, he was advised of his Miranda
 
 [5]
 
 rights and placed under arrest.
 

 In addition, Mr. Lobo read and signed a consent form, allowing his home to be searched. Crime Scene arrived and took photographs. The objective of the search was to locate the clothing that Mr. Lobo was wearing on the day of the incident. In connection with the investigation, two pair of pants, some underclothes, and a shirt was taken from Mr. Lobo’s home and logged into evidence. Likewise, photographs, a sheet, and clothing worn by the victim were taken from her apartment and logged into evidence.
 

 After a search of Mr. Lobo’s home was conducted, he was placed in a police unit and transported to the police station. Officer Morehouse and Detective Hoffman took the victim to Lakeside Hospital for testing. Officer Urrata later met with Mr. Lobo when he gave a statement to the police.
 

 Detective Hoffman, employed with the Kenner Police Department for about 18 years, testified that on June 7, 2009, he participated in the Lobo investigation. On the day of the incident, he and Officer Irma Morehouse brought the victim to the hospital where a rape kit examination was performed. Detective Hoffman did not know the results. Afterwards, Detective Hoffman went to the Kenner police 17station where he interviewed Mr. Lobo about three hours after Mr. Lobo was taken in custody.
 

 The recorded statement was played for the jury.
 

 In his statement, Mr. Lobo agreed that before taking his statement, Officer Urrata advised him of his constitutional rights from the waiver form, which he signed to voluntarily give the statement. In his statement, Mr. Lobo admitted that he went into the darkened upstairs bedroom to get alcohol and he closed the door. He further stated that he got on top of A.R. and he kissed her. A.R. began unbuttoning his shirt and he started taking her shirt off. Then she started pulling his pants down. At this point, he was kissing her neck and everything. However, he denied that he had an erection or penetrated her. He thought that A.R. believed that he was A.R.’s boyfriend. However, when he kissed her she stated that she thought he was C.E. and said “no, no.” She also started crying. At first Mr. Lobo said she pushed him but later he denied that she pushed him. Nevertheless he stated he fell. Since they were on the second floor, the others in the residence heard him fall. He had blood on his body somewhere below his belly button but above his penis from the menstruating victim. He also stated that his hand had blood on it possibly by his touching his stomach. When asked whether he penetrated her vagina, he replied: “Uh, not really because touching it. But not really. I did not penetrate.” Detective Hoffman testified that Mr. Lobo admitted that his penis and stomach area touched the victim’s vagina but that the penis never penetrated the vagina.
 

 
 *433
 
 | sSufficiency
 
 [6]
 

 Mr. Lobo contends that the state failed to prove beyond a reasonable doubt that a sexual battery took place. He further contends that the victim’s testimony must be evaluated by “the self-described condition” that she was in at the time. Specifically, Mr. Lobo points out that the victim testified that she was “profoundly sleeping” and had consumed alcohol. The state responds that there was sufficient evidence to convict.
 

 The constitutional standard for testing the sufficiency of the evidence, as enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 See State v. Ortiz,
 
 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930,
 
 cert. denied,
 
 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998);
 
 State v. Bailey,
 
 04-85, p. 4 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55,
 
 writ denied,
 
 04-1605 (La.11/15/04), 887 So.2d 476,
 
 cert. denied,
 
 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 State v. Harrell,
 
 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019.
 

 “Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.”
 
 State v. Kempton,
 
 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La.R.S. 15:438. This requirement of La.R.S. 15:438, however, does not establish a standard that is separate from the
 
 Jackson
 
 standard, but instead provides a helpful methodology for determining the existence of reasonable doubt.
 
 State v. Lathers,
 
 03-941 (La.App. 5 Cir. 2/23/04), 868 So.2d 881, 884.
 

 On appeal, the reviewing court does not determine if another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events. Instead, the appellate court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under the
 
 Jackson
 
 standard.
 
 State v. Durand,
 
 07-4, p. 8 (La.App. 5 Cir. 6/26/07), 963 So.2d 1028, 1034, writ
 
 denied,
 
 07-1545 (La.1/25/08), 973 So.2d 753.
 

 Mr. Lobo was convicted of sexual battery in violation of La.R.S. 14:43.1. To support a conviction for sexual battery in this case, the state was required to prove that the defendant intentionally touched the victim’s anus or genitals with an in
 
 *434
 
 strument or any part of his body or that the victim touched his anus or genitals with an instrument or any part of her body. The act must be performed without the victim’s consent. La.R.S. 14:43.1.
 

 Since the word “intentional” is included in the above definition of sexual battery without a qualifying provision, this Court has held that, under La.R.S. 14:11, only general criminal intent is required as an essential element of this crime.
 
 State v. Stevenson,
 
 05-52, p. 6 (La.App. 5 Cir. 6/28/05), 908 So.2d 48, 52,
 
 writ denied,
 
 05-2592 (La.6/2/06), 929 So.2d 1247 (citation omitted). General criminal 110intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences to follow his act.
 
 Stevenson,
 
 05-52 at 6-7, 908 So.2d at 53. In other words, general criminal intent is shown by the very doing of the acts which have been declared criminal.
 
 Id.
 
 (citation omitted).
 

 While the victim testified that Mr. Lobo’s penis penetrated her vagina, Mr. Lobo denied this. Still, he admitted being unclothed and on top of the victim. When asked whether he penetrated her vagina, he replied: “Uh, not really because touching it. But not really. I did not penetrate.” (Emphasis added). According to Detective Hoffman, Mr. Lobo admitted that his penis and stomach area touched the victim’s vagina but that the penis never penetrated the vagina.
 

 The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier-of-fact.
 
 State v. Jones,
 
 08-20, p. 7 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240,
 
 writ denied,
 
 09-2394 (La.10/15/10), 46 So.3d 1282. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness.
 
 Id.
 

 In addition, Mr. Lobo argues that the victim could not be certain of the events because she was sleeping and had consumed alcohol. Mr. Lobo cites
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988) and
 
 State v. Johnson,
 
 03-903 (La.App. 5 Cir. 12/9/03), 864 So.2d 645, in support of his argument. Specifically, he notes that the
 
 Johnson
 
 Court commented:
 

 A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). In absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony if believed by the trier of fact, is sufficient support for a h requisite factual finding.
 
 State v. Stec.,
 
 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.
 

 Mr. Lobo further notes that the
 
 Mussall
 
 Court found that even in a light favorable to the prosecution, a rational trier of fact could not have found defendant guilty beyond a reasonable doubt because of the “numerous eccentricities, unusual coincidences and lack of corroboration.” Mr. Lobo contends that the victim could not be certain of the events that took place because by her own admission she had been drinking and was profoundly asleep. And there was no eyewitness or medical/scientific corroboration.
 

 It is within the jury’s sound discretion to weigh the credibility of the evidence presented.
 
 Jones, supra.
 
 The jury evidently gave more weight to the fact that the victim woke up with Mr. Lobo on top of her and, according to the victim, his penis was penetrating her vagina. When
 
 *435
 
 wakened, A.R. realized that the person on top of her was not C.E. because C.E. was wearing a long-sleeved shirt rather than a short-sleeved 'one. Thus, the jury could have reasonably concluded that although the victim was asleep initially, she woke with full awareness and threw Mr. Lobo off her when he was penetrating her. vagina with his penis. Moreover, A.R.’s testimony concerning penetration is not internally inconsistent. Although there were no eyewitnesses to the actual event, there was sufficient circumstantial evidence corroborating the victim’s account. Mr. Lobo admitted he fell from the bed after the victim refused his advances and others in the residence heard the thumping sound of the fall. He also admitted that he was unclothed and on top of the victim.
 

 After viewing the evidence in the light most favorable to the state, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction of sexual battery.
 

 | i2Thus, this assignment of error lacks merit.
 

 Suppression
 

 The State has the burden of proving the admissibility of a purported confession or statement by the defendant.
 
 State v. Arias-Chavarria,
 
 10-116, p. 11 (La.App. 5 Cir. 9/28/10), 49 So.3d 426, 433, writ
 
 denied,
 
 10-2432 (La.2/25/11), 58 So.3d 460, citing LSA-C.Cr.P. art. 703(D). Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his
 
 Miranda
 
 rights, that he voluntarily and intelligently waived his
 
 Miranda
 
 rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.
 
 Arias-Chavarria,
 
 10-116 at 11-12, 49 So.3d at 433, citing
 
 State v. Franklin,
 
 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70,
 
 writ denied,
 
 03-3062 (La.3/12/04), 869 So.2d 817; LSA-R.S. 15:451;
 
 State v. Blank,
 
 04-0204, pp. 9-10 (La.4/11/07), 955 So.2d 90, 103,
 
 cert. denied,
 
 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).
 

 A determination of voluntariness is made on a case-by-case basis, depending on the totality of the facts and circumstances of each situation. Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given.
 
 Arias-Chavarria,
 
 10-116 at 12, 49 So.3d at 433, citing
 
 State v. Mackens,
 
 35,350, p. 13 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, 463,
 
 writ denied,
 
 02-0413 (La.1/24/03), 836 So.2d 37.
 

 The admissibility of a confession or statement is a determination for the trial judge and the judge’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession or statement are entitled to great weight and will not be overturned unless unsupported by the evidence.
 
 Id.,
 
 citing
 
 Franklin, supra.
 
 In addition, a trial court’s determination on the motion to suppress should not be disturbed on appeal, unless it is clearly wrong.
 
 State v. Addison,
 
 08-461, p. 12 (La.App. 5 Cir. 2/10/09), 8 So.3d 707, 716.
 

 Mr. Lobo argues now for the first time on appeal that the state never asked whether or not Mr. Lobo understood English, the form was not printed in Spanish, and Officer Urrata was not bilingual as evidenced by the necessity of another police officer to act as a translator in interviewing the victim. He argues that it should have been determined that Mr. Lobo could read and write the English language.
 

 
 *436
 
 A defendant bears the burden of asserting the basis for his motion to suppress in order to give the State adequate notice so that it may present evidence and address the issue.
 
 State v. Jackson,
 
 04-1388, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911,
 
 writ denied,
 
 05-1740 (La.2/10/06), 924 So.2d 162 (citing in part La.C.Cr.P. art. 703(E)). After the defendant files a motion to suppress, the state has the burden to prove the defendant’s confession was of a free and voluntary nature. La.C.Cr.P. art. 703(D). Therefore, the defendant is limited, on appeal, to the grounds he articulated at trial; a new basis for the claim, even if it would be meritorious, cannot be raised for the first time on appeal.
 
 Id.
 

 In this case, in his motion to suppress the confession, Mr. Lobo failed to raise the argument that Mr. Lobo was never questioned as to whether he could read and write the English language. In the proceedings below Mr. Lobo did not present any evidence, or argument at the motion to suppress hearing regarding this specific ground for suppression that he now argues on appeal. Accordingly, these grounds are not properly before this court. But even so, the advice of rights/waiver form contains Mr. Lobo’s signature acknowledging that he understood what the officer read to him from the form. The form also included Mr. Lobo’s | ^acknowledgement that he had the ability to read and write and completed the 12th grade. Thus, the officer ascertained that Mr. Lobo could read and write and understood the English language. Further, at trial, Officer Urrata stated that Mr. Lobo spoke English.
 

 Mr. Lobo argues now as he did below that the state failed to prove that Mr. Lobo gave a free and voluntary statement or that Mr. Lobo was adequately advised of his
 
 Miranda
 
 rights. He asserts that even assuming those warnings were given, that fact alone does not establish a knowing or intelligent waiver of those rights. He contends that at most the state proved that Mr. Lobo was read unspecified rights since the state failed to articulate what rights were provided to Mr. Lobo, what rights may have been contained on the form, and what rights Mr. Lobo actually waived. The state disagrees.
 

 Mr. Lobo relies on the evidence and testimony presented at the pretrial suppression hearing. At the suppression hearing, only Officer Urrata testified while at trial, Officer Urrata and Detective Hoffman testified.
 

 At the suppression hearing, Officer Ur-rata stated that she was employed with the Kenner Police Department for about three and a half years. She testified that on June 6, 2009, she was the reporting officer in reference to a simple rape allegation against Mr. Lobo. Before taking Mr. Lobo’s taped statement, Officer Urrata advised him of his rights. Mr. Lobo stated that he understood his rights and waived them. In addition, Mr. Lobo signed the Advice of Rights Form indicating such. Officer Urrata stated that she asked Mr. Lobo the questions from the form, he advised of the answer, and she physically marked the appropriate answer with an “X” on the form. Mr. Lobo was then allowed to re-read the form. Then he signed it.
 

 | iSThe form was introduced into evidence at the suppression hearing. According to the form, Mr. Lobo acknowledged that he understood the following rights that the officer read to him:
 

 1. You have the right to remain silent.
 

 2. Anything you say may be used against you in court.
 

 3. You have a right to consult with and obtain the advice of an attorney before answering any questions.
 

 
 *437
 
 4. If you cannot afford an attorney, the court will appoint an attorney to represent and advise you.
 

 5. You have a right to have your attorney present at the time of any questioning or giving of any statement.
 

 6. If you decide to answer questions now without an attorney present, you will still have the right to stop answering at any time until you talk to an attorney.
 

 According to the form, Mr. Lobo acknowledged that he understood what was read to him and he was willing to answer questions at that time without a lawyer. He also acknowledged that no threats or promises had been made to him nor was any pressure of any kind applied to induce him to answer questions or to give up any of his rights. Then, he acknowledged that with full knowledge of his rights, he wanted to waive all privileges against self-incrimination and make a statement about his knowledge of the crime.
 

 Additionally, Officer Urrata testified at the suppression hearing that neither she nor Detective Hoffman, who questioned Mr. Lobo, threatened, coerced, or forced Mr. Lobo to give a statement; nor did they promise him anything in exchange for his statement. Officer Urrata was present when Mr. Lobo gave his taped statement to Detective Hoffman. Detective Hoffman also discussed the Advice of Rights Form with Mr. Lobo, prior to questioning him.
 

 At trial, Officer Urrata and Detective Hoffman testified.
 

 Officer Urrata’s testimony was substantially similar to her testimony given at the suppression hearing. She testified that after the victim and witness identified Mr. Lobo, he was advised of his
 
 Miranda
 
 rights and placed under arrest. 1 ^Specifically, Mr. Lobo was advised that: “... he had the right to remain silent. Anything he said could be used against him in the Court of law. He had a right to an attorney. If he could not afford an attorney, one would be appointed to him.” Officer Urrata further stated that Mr. Lobo spoke English, and he advised her that he understood his rights.
 

 Officer Urrata testified at trial that at the police station, Officer Urrata advised Mr. Lobo of his rights for a second time, using a form. Officer Urrata read the form to him and Mr. Lobo signed the form acknowledging that he understood his rights and, further, that he was waiving them. The form was introduced into evidence at trial without objection and provided to the jury. After Mr. Lobo completed the form, his taped statement was taken by Detective Hoffman. In addition, Officer Urrata asserted that Mr. Lobo was not forced, threatened, or coerced into giving a statement.
 

 Detective Hoffman testified that before speaking to Mr. Lobo, around 2:00 a.m., he made certain Mr. Lobo understood his rights. Specifically, he made sure he was the person that signed the form and that he did understand his rights. He did not force, threaten, or promise Mr. Lobo anything in exchange for the statement. Mr. Lobo waived his rights and gave a recorded statement.
 

 Mr. Lobo cooperated with the investigators and gave a statement, which was recorded and transcribed. In addition, Detective Hoffman stated that he did not force, threaten, coerce, or promise defendant anything in exchange for his statement.
 

 As a general rule, an appellate court may review the testimony at trial in determining the correctness of the trial court’s pre-trial ruling on a motion to suppress.
 
 State v. Sherman,
 
 04-1019, p. 1 (La.10/29/04), 886 So.2d 1116, 1116 (per
 
 *438
 
 curiam) and the cases cited therein. This review may provide supplemental | ^information relevant to the suppression issue.
 
 Id.
 
 In many cases the testimony at trial may not diverge from the evidence adduced at a pretrial hearing on a motion to suppress.
 
 Id.
 
 at 2, 886 So.2d at 1116.
 

 We have reviewed supplemental information given at the trial relevant to the suppression issue. That evidence, does not, however, affect the result we reach.
 

 At the suppression hearing, although Officer Urrata did not articulate the specific rights during her examination, she nonetheless referenced the form that Mr. Lobo signed. That form, which she read fully to him, sets forth a complete recitation of the
 
 Miranda
 
 rights, Mr. Lobo’s understanding of these, and his non-coerced waiver. Under the totality of circumstances presented at the suppression hearing, there was evidence showing that Mr. Lobo’s signed a written waiver of his
 
 Miranda
 
 rights and his statement was intelligently and voluntarily made.
 

 Nevertheless, we have taken into consideration the trial testimony. That testimony is consistent with the evidence presented at the suppression hearing. All of the testimony and evidence at the suppression hearing and at trial supports the trial judge’s denial of the motion.
 

 Thus, this assignment of error lacks merit.
 

 Sentencing/Error Patent
 

 Mr. Lobo argues that the district court erred in denying his motion to reconsider his eight-year sentence because it was excessive. The state responds that the record fails to reflect that the trial court ruled on the motion. Therefore, it is premature to address Mr. Lobo’s excessive sentence claims. We agree that the sentencing assignments are premature.
 

 We reviewed the record for errors patent, according to La.C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). We found, based on the record before us, that the trial judge failed to rule on the motion to reconsider sentence.
 

 La.C.Cr.P. art. 881.4 provides that if it is “necessary to an appropriate disposition of a motion to reconsider sentence, the appellate court may remand the case to the district court with instructions to supplement the record or to hold an evidentiary hearing.” When an appellant alleges a sentencing error on appeal along with one or more additional errors, and when the trial court has failed to rule on the appellant’s timely motion to reconsider sentence, this Court has ruled on the merits of the other assignments and remanded for a ruling on the outstanding motion.
 
 State v. Mosley,
 
 10-266, p. 7 (La.App. 5 Cir. 11/9/10), 54 So.3d 692, 697.
 

 Thus, we remand for a ruling on the motion to reconsider sentence with these instructions:
 

 If the motion to reconsider is granted and the defendant is re-sentenced, he may appeal the new sentence. If the motion is denied or if it has already been ruled on, the defendant must move to re-lodge this appeal within sixty days of the date of the ruling on the motion to reconsider sentence or the date of this opinion, whichever is later.
 

 State v. Bolden,
 
 03-266, p. 22 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1065.
 

 The record also reveals that the commitmentyminute entry incorrectly reflects that Mr. Lobo entered a plea and that he was advised of his rights in connection with that plea. Rather, Mr. Lobo was found guilty after a jury trial. This error is clerical. Since a clerical error does not cause prejudice to a defendant’s rights, such error does not merit reversal.
 
 State
 
 
 *439
 

 v. Quest,
 
 00-205, p. 10 (La.App. 5 Cir.10/18/00), 772 So.2d 772,
 
 writ denied,
 
 00-3137 (La.11/2/01), 800 So.2d 866, citing
 
 State v. Gilmore,
 
 522 So.2d 658, 661 (La. App. 5 Cir.1988). However, we will order an amendment of the minute entry/commitment to delete the reference to a plea.
 

 1,Accordingly, we hereby order that the minute entry/commitment be amended to reflect a jury trial, in conformity with this opinion.
 

 Furthermore, we direct the clerk of court to transmit the original of the minute entry/commitment to the officer in charge of the institution to which Mr. Lobo has been sentenced, La.C.Cr.P. art. 892(B)(2);
 
 State ex rel. Roland v. State,
 
 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam), and to the legal department, the Department of Public and Safety Corrections (DOC).
 

 Conclusion
 

 For the foregoing reasons, the defendant’s conviction is affirmed. We remand with instructions for a ruling on the motion to reconsider sentence. We also remand this matter for the trial court to amend the minute entry/commitment as ordered.
 

 AFFIRMED; REMANDED
 

 [1]
 

 . The state notes that the trial judge sentenced Mr. Lobo to the Department of Corrections rather than “hard labor.” Because La. R.S. 15:824(C) provides that "only individuals actually sentenced to death or confinement at hard labor shall be committed to the Department of Corrections,” the trial judge clearly imposed a hard labor sentence.
 

 [2]
 

 .
 
 See
 
 sentencing assignments of error for further discussion on this matter.
 

 [3]
 

 . Mr. Lobo states in brief that one of the issues is whether the trial court correctly instructed the jury as to the applicable law. He does not, however, list that as an assignment of error nor does he brief the issue. "The court may consider as abandoned any specification or assignment of error which has not been briefed.” Uniform Rules-Courts of Appeal, Rule 2-12.4. Therefore, we deem the jury charge issue abandoned.
 

 [4]
 

 .In compliance with La.R.S. 46:1844(W), several names are replaced with initials to protect the victim's identity.
 

 [5]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).
 

 [6]
 

 . When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.
 
 State v. Hearold,
 
 603 So.2d 731, 734 (La.1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.
 
 Id.
 
 Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial.
 
 Id.